RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0044P (6th Cir.)
File Name: 01a0044p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

JAMES E. MCCURDY,
      *Plaintiff-Appellant,*

    *v.*

No. 99-3473

MONTGOMERY COUNTY,
OHIO, et al.,
      *Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 96-00498—Michael R. Merz, Magistrate Judge.

Argued: May 4, 2000

Decided and Filed: February 16, 2001

Before: ENGEL, JONES, and COLE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:** Zach Zunshine, Columbus, Ohio, for Appellant. Michael Russell, OFFICE OF THE PROSECUTING ATTORNEY FOR THE COUNTY OF MONTGOMERY, Dayton, Ohio, for Appellees. **ON BRIEF:** Zach Zunshine, Columbus, Ohio, for Appellant. Michael Russell, OFFICE OF THE PROSECUTING ATTORNEY FOR THE

1

COUNTY OF MONTGOMERY, Dayton, Ohio, for Appellees.

JONES, J., delivered the opinion of the court, in which COLE, J., joined. ENGEL, J. (pp. 17-26), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

NATHANIEL R. JONES, Circuit Judge. Plaintiff-Appellant James McCurdy brought this § 1983 suit against Defendants-Appellees Officer David Cole and Montgomery County, claiming that they violated his right to be free from unreasonable seizures under the Fourth Amendment and retaliated against him for the assertion of his First Amendment rights. The district court dismissed McCurdy's First Amendment retaliation claim after granting Officer Cole's motion for qualified immunity, and a jury returned a verdict for Defendants on McCurdy's Fourth Amendment claim. McCurdy then moved for judgment as a matter of law, or a new trial in the alternative, and the district court denied these motions in their entirety. For the following reasons, we **REVERSE** both the district court's denial of McCurdy's motion for judgment as a matter of law on his Fourth Amendment claim and its grant of qualified immunity on McCurdy's First Amendment retaliation claim. Accordingly, we **REMAND** for further proceedings.

**I.**

On July 6, 1996, McCurdy hosted a graduation party for his nephew, Dwayne Smith, who had just graduated from Wright State University. The party was held at the clubhouse in the apartment complex where McCurdy then resided in Centerville, Ohio. The party ended around midnight, and while most of the patrons went home at that time, McCurdy and several others, including his brother-in-law Roger Smith

creating the qualified immunity doctrine, intended to so hobble a police officer in the course of his duties.

and acquaintance Heath Goolsby, went to McCurdy's apartment to play cards. McCurdy had consumed alcohol both at the clubhouse party and the card game in his apartment. Around five in the morning, McCurdy and his son, James McCurdy Jr., accompanied Smith and Goolsby to their cars to see them off. The four men, who are all African-American, conversed for about fifteen minutes when a police cruiser drove by.

Officer Cole, who was on "routine patrol" and not responding to any specific complaints concerning McCurdy's apartment or the surrounding area, drove past McCurdy and company very slowly. After this initial drive-by, Officer Cole, without any provocation from McCurdy or his group, circled back towards them. As Officer Cole drove by the group for a second time, he, in his own words, "stopped and observed them for just a few seconds and [to] gain their attention . . . said what's up gentlemen?" J.A. at 161. At that point, Officer Cole recalled McCurdy asking either "what's the problem?" or "can I help you?" *Id.* Officer Cole, who had parked his car a short distance away from the men, could not hear McCurdy and asked him to repeat what he had said. According to Officer Cole, McCurdy then demanded, "what the fu*k do you want?" *Id.*

Office Cole then exited his vehicle and approached McCurdy. According to Officer Cole, he then questioned McCurdy as to why he used profane language in addressing him. After McCurdy reiterated his queries as to the reason for Officer Cole's approach, the officer asserted that it was his job to "see what's going on" if "somebody's standing out here at 5:00 in the morning." J.A. at 162. According to Officer Cole, McCurdy then exclaimed "what the fu*k is your job?" and Officer Cole asked him, as well as Smith, Goolsby, and McCurdy Jr., for identification. McCurdy responded that he was standing in front of his home, that he was without identification, and that neither he nor his friends needed to display any.

Officer Cole next asked McCurdy if he had been drinking that night. Upon responding in the affirmative, the fifty-three year old was ordered to go back inside his house because he lacked identification and was, in Officer Cole's view, "obviously intoxicated." *Id.* at 162-163. McCurdy rejected Officer Cole's admonishment, claiming that he did not have to go inside and that, furthermore, he did not have to do "sh*t" that Officer Cole ordered. *Id.* at 163. After McCurdy reiterated his objections to Officer's Cole purported harassment, Officer Cole warned that if he did not return to his home immediately, he would be arrested and taken to jail. McCurdy then questioned the grounds on which he could be arrested. The officer responded by simply repeating that if he did not go inside, he would be arrested. Once again, McCurdy refused to return to his home, whereupon Officer Cole told him to step to the side and place his hands on the wall. McCurdy again questioned the grounds for arrest. Without specifying the legal basis for the arrest, Officer Cole proceeded to take him into custody. Officer Cole subsequently brought McCurdy to the precinct station and arrested him for Disorderly Conduct/Public Intoxication and Obstructing Official Business under Ohio Rev. Code §§ 2917.11(B)(2) & 2921.31, respectively.

McCurdy subsequently sued Officer Cole and Montgomery County, asserting *inter alia* that he was arrested in violation of both the First and Fourth Amendments. During jury proceedings, McCurdy contended that the County illegally exercised one of its peremptory challenges on the basis of race. Originally, there were three black members among the twenty-six person venire. *See* J.A. at 37. One black venireperson was excused for cause because he was connected to the County Sheriff's office, and three white members were also excused for cause. With these dismissals, twenty-two persons, including two African-Americans, remained in the venire from which a jury of eight needed to be selected. Initially, an eight-person jury was seated without any black members. After McCurdy exercised the second of his two peremptory challenges, and after the County passed

illustrates the uncertain posture of the law at the time of the events involved here.

Because the federal courts are still disputing the issue of retaliation in the context of an arrest, it can hardly be said that it should have been apparent to Officer Cole in 1996, that he could not arrest an individual, even though he had probable cause to effect the arrest, if the individual's protected speech at the time had any impact on the officer's decision to arrest.

*Mt. Healthy* counsels affirmance here even though Officer Cole may in fact have been influenced by the foul and abusive language employed by Mr. McCurdy. Particularly relevant is the Supreme Court's observation that some incidents inevitably remain on the minds of those responsible for making decisions. "A rule of causation which focuses solely on whether protected conduct played a part, substantial or otherwise, in a decision not to rehire could place an employee in a better position as a result of the exercise of a constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy,* 429 U.S. at 285. Applying that principle to the case here, it is even more disturbing that a drunk using offensive and foul language in the course of a *Terry* stop, could for that reason alone under the pretense of First Amendment protected speech, intimidate and goad a police officer into believing that he dare not do what he conceives to be his duty lest somehow he violate that drunk's constitutional rights. As Justice Rehnquist stated: "The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in that conduct." *Mt. Healthy*, 429 U.S. at 285-86. Certainly an individual should not be arrested because of constitutionally protected offensive language. But the same individual ought not to be able, by using offensive language, to prevent a police officer from assessing his conduct, and reaching a decision to arrest him, simply because the offensive language makes the police officer more certain of the correctness of his decision. *See Mt. Healthy*, 429 U.S. at 286. I do not believe that the Supreme Court, in

be apparent in the light of pre-existing law.  *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)). It is not a matter of trying to figure out at the scene just what F--- words or other epithets amount to or do not amount to "fighting words" by legal precedent, or determining in a judicial post-mortem whether they should.

   The relevant pre-existing law on the issue of retaliation is found in *Mt. Healthy City Board of Educ. v. Doyle*, 429 U.S. 274 (1977).  *Mt. Healthy* involved a school board's decision not to rehire a teacher in retaliation for his exercise of constitutionally protected speech.  Because *Mt. Healthy* did not involve a police officer's decision to arrest, an obligation at the core of the officer's responsibilities, and necessarily made on the spot without the luxury of investigation, it was not apparent that *Mt. Healthy* would govern the police officer's conduct.

   Whether a plaintiff may recover for a deprivation of First Amendment rights caused by an allegedly retaliatory arrest which the officer had probable cause to effect was not a matter of clearly established law in 1996. Indeed, it is still an issue that is subject to debate in the federal courts.  The majority cites no Supreme Court or published Sixth Circuit cases discussing retaliation claims in the context of an arrest, and I am aware of none.  The defendants raised the argument that no retaliation claim may be brought if the arrest is supported by probable cause in *Estate of Dietrich v. Burrows*, 167 F.3d 1007 (6th Cir. 1999), but the validity of this position was not ruled on because there was a previous finding that there was no probable cause.  *Id.* at 1013.  We did consider this issue in an unpublished case, *Sandul v. Larion*, 52 F.3d 326 (Table), 1995 WL 216919 (6th Cir. 1995).  In *Sandul* we suggested that if the officers had probable cause to support the arrest, their actual motives were irrelevant. *Id*. at *4 (quoting *Criss v. City of Kent*, 867 F.2d 259 (6th Cir. 1988)). Recognizing that *Sandul* is no more authoritative than many of the cases cited by the majority, it nonetheless well

on exercising its first, African-American Sylvia Williams was seated on the jury.  At that point, the County used its last peremptory to excuse Williams, and McCurdy objected that the strike was racially motivated.  Without questioning Williams, or engaging in a colloquy with either McCurdy's or the County's counsel, the district court rejected McCurdy's objection, crediting the County's assertions that Williams' demeanor showed that she was disinterested in serving on the jury.

   After the trial commenced, the district court granted qualified immunity to Officer Cole on McCurdy's First Amendment retaliation claim.  The court concluded that it was not clearly established that the First Amendment prohibited an officer from effectuating an otherwise valid arrest if that officer was partially motivated by a desire to retaliate against the arrestee's assertion of First Amendment rights. *See* J.A. at 35-36.  The trial proceeded on McCurdy's remaining claims, and the jury returned a verdict in favor of Defendants.   McCurdy then moved for judgment notwithstanding the verdict, or in the alternative, a new trial. McCurdy claimed that Officer Cole did not have probable cause to arrest him, and essentially renewed a challenge to the district court's qualified immunity judgment by re-asserting his First Amendment retaliation claim.  McCurdy also re-asserted his claim that the County exercised one of its peremptories in violation of the Equal Protection Clause. The district court denied McCurdy's motion in its entirety, and McCurdy filed this timely appeal.

## II.

### A.

   On appeal, McCurdy first asserts that the district court erred in denying his motion for judgment notwithstanding the verdict, or new trial in the alternative.  This court reviews the denial of a motion for judgment as a matter of law *de novo*, *see Cook v. American Steamship Co.*, 53 F.3d 733, 740 (6th

Cir. 1995), and the denial of a motion for new trial for an abuse of discretion. *See Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000). Like the district court, we must affirm the jury's verdict "unless this Court 'is left with the definite and firm conviction that a mistake resulting in plain injustice has been committed,' or . . . the verdict 'is contrary to all reason.'" *Schoonover v. Consolidated Freightways Corp.*, 147 F.3d 492, 494 (6th Cir. 1998) (citation omitted). Judgment as a matter of law "is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000).

Although McCurdy has not asserted his appellate claims in the most artful fashion, his first claim essentially contends that Officer Cole did not have probable cause to arrest him, and that he therefore violated his Fourth Amendment right against unreasonable searches and seizures. While the Fourth Amendment allows brief investigatory detentions, or "Terry" stops, to be justified on the basis of a "reasonable suspicion," *see Terry v. Ohio*, 392 U.S. 1, 21-22 (1968), a full-fledged arrest must be supported by probable cause. *See Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000).

Probable cause requires that police have reasonably trustworthy information sufficient to warrant an officer of reasonable caution to believe the arrestee committed, or is in the process of committing, an offense. *See Centanni v. Eight Unknown Officers*, 15 F.3d 587, 592 (6th Cir. 1994) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010-11 (6th Cir. 1999). Probable cause further requires that officers articulate concrete and objective facts from which they infer criminal conduct. *See United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998). Moreover, the objective reasonableness of the facts relevant to a probable cause determination is paramount, and the officer's subjective intentions are irrelevant. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective

details of rape in retaliation for the plaintiffs' exercise of their first amendment right to criticize public officials. *Id.* at 678. We reversed the district court's grant of qualified immunity to the sheriff. We reasoned that the right to criticize public officials was clearly established, as was the principle that a public official's retaliation against an individual for exercising First Amendment rights is a violation of § 1983. *Id.* at 682-83.

There are two problems with the majority's reliance on *Bloch*. First, *Bloch* had not been decided at the time Officer Cole arrested McCurdy. Officer Cole's arrest of McCurdy occurred in 1996. *Bloch* was not decided until 1998. Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This means that the applicable law must have been clearly established at the time the action occurred. *Id.* "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

Second, *Bloch* involved a sheriff's press release. It did not involve an arrest. Even if we accepted that the law articulated in *Bloch* was clearly established in 1996, the retaliatory action alleged in *Bloch* did not arise in the context of an arrest.

As noted in *Anderson v. Creighton*, 483 U.S. 635 (1987), the operation of the qualified immunity standard depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. *Id.* at 639. The contours of the right the official is alleged to have violated must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 640. Qualified immunity does not turn on whether the very action in question has previously been held unlawful, but the unlawfulness must

Whether to arrest or not is a judgment call made on the spot by the officer, and accordingly the evidence supporting the officer's probable cause determination does not require the same degree of specificity as the evidence to support a conviction beyond a reasonable doubt.

The jury in this case was properly instructed on the elements of risk of physical harm, and the definition of risk as a significant as opposed to a remote possibility. While the evidence of disorderly conduct might not have been very strong, there was some evidence. Because it cannot be said that there was a complete absence of fact to support the jury's verdict that the arrest was supported by probable cause, this Court should affirm. *See Pouillon v. City of Owosso*, 206 F.3d 711, 719 (6th Cir. 2000).

I also disagree with the majority's view in Part B of the opinion that the district court erred in granting Officer Cole's motion for qualified immunity on the First Amendment claim. I find this a more difficult question but believe it is mooted out by the specific findings of the trial court and the jury in all events.

The majority holds that the district court erred in its conclusion that when Officer Cole acted, it was not clearly established that the First Amendment prohibited an officer from effectuating an otherwise valid arrest if that officer was motivated in part by a desire to retaliate against the arrestee's assertion of First Amendment rights. The majority reasons that because it was well-established then that McCurdy had a constitutional right to challenge verbally Officer Cole's surveillance, the district court erred in granting Officer Cole qualified immunity on the retaliation claim.

In support of this position, the majority relies on *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998). In *Bloch* a rape victim and her husband filed a § 1983 retaliation claim against a sheriff who they alleged had violated their constitutional rights by issuing a press release discussing the sensitive

intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); *Ornelas v. United States*, 517 U.S. 690, 696 (1996) (holding that probable cause is assessed from the perspective of an objectively reasonable police officer). In assessing objective reasonableness, however, we must account for the ability of officers to draw inferences based on their professional experiences. *See id.*, 517 U.S. at 700.

Here, Officer Cole arrested McCurdy for Disorderly Conduct under Ohio Rev. Code 2917.11(B)(2). The statute provides that:

> No person, while voluntarily intoxicated, shall . . . [e]ngage in conduct or create a condition that presents a risk of physical harm to the offender or another, or to the property of another.

O.R.C. § 2917.11(B)(2). The statute therefore requires both that an individual is "voluntarily intoxicated" *and* that the individual "present[] a risk of physical harm" either to himself, another, or another's property. *Id.* This second element requires some affirmative showing of dangerousness, as the sole fact that an individual is intoxicated does not give rise to a § 2917.11(B)(2) infraction. *See State v. Pennington*, No. 1998CA00137, 1998 WL 818632, at *1-*2 (Ohio App. Nov. 16, 1998) (not reported in N.E.2d) (citing § 2917.11(B)(2)'s legislative history, asserting that the provision "is aimed at particular conduct, rather than at the condition [of intoxication]"); *State v. Jenkins*, No. L-97-1303, 1998 WL 161190, at *7 (Ohio App. Mar. 31, 1998) (not reported in N.E. 2d) (holding that § 2917.11(B)(2) requires "some affirmative conduct on the part of the defendant and [does not] prohibit merely being intoxicated in public").[1]

---

[1] In dissent, Judge Engel observes that the *Pennington* and *Jenkins* cases which we have cited are unpublished opinions that were filed two years after Officer Cole arrested Mr. McCurdy. He argues that it is unfair to utilize these opinions to analyze Officer Cole's culpability because such an analysis requires Officer Cole to have anticipated what the law

The statute further provides that the determination as to whether an individual is intoxicated is determined from the perspective of an "ordinary observer." O.R.C. § 2917.11(D). Although § 2917.11 does not provide a definition of intoxication under § 2917.11(B)(2), the district court provided the jury with the following instruction:

> A person is intoxicated who is so far under the influence of intoxicating liquor, wine, or beer that his physical and mental faculties are impaired to such an extent that he fails to use that degree of care and attention in his conduct which a reasonable person would otherwise use.

J.A. at 32.

McCurdy argues that there was insufficient evidence to support a finding that he was intoxicated or presented "a risk of physical harm to [himself], another, or to the property of another" as required under § 2917.11(B)(2). With regard to the voluntary intoxication element, Officer Cole testified that he smelled alcohol on McCurdy's breath during his conversation with him and that he believed McCurdy was intoxicated past the level where he could take care of himself. *See* J.A. at 151; Cole Tr. at 180-81. Additionally, Officer Cole asked McCurdy whether he had been drinking that night, and McCurdy responded in the affirmative. Although Officer

---

would be in the future. I agree that it is generally not fair to hold an individual to a legal standard that emerges after the fact. However, Officer Cole's culpability does not turn on the *Pennington* and *Jenkins* decisions as the dissent suggests. Officer Cole's culpability is based on the plain language of the statute that he relied upon to affect the arrest of Mr. McCurdy. As noted above, § 2917.11(B)(2) does not prohibit "voluntarily intoxication" in and of itself. In order to violate this statute an individual must also "present[] a risk of physical harm" either to himself, another, or another's property. See § 2917.11(B)(2). Officer Cole did not have probable cause to believe that Mr. McCurdy presented "a risk of physical harm." Accordingly, Officer Cole is guilty of violating Mr. McCurdy's Fourth Amendment rights. This would be true even if the *Pennington* and *Jenkins* cases had never been decided.

he was arrested under, like OHIO REV. CODE ANN. § 2917.11(B)(2) (the statute at issue in this case), required "some affirmative conduct" on the part of the defendant beyond merely being intoxicated in public. *Jenkins,* 1998 WL 161190 at *6. The court specifically held that "the officer had probable cause to arrest and search appellant for disorderly conduct where appellant parked his car to obstruct traffic flow into a carry-out store. Appellant created a risk of harm to himself and others as well as to any car which may have entered that driveway." *Id.* at *7. Thus, Jenkins' conviction was affirmed in that case in all events.

In *Pennington*, *supra*, the appellant resisted efforts of police to talk to him after the police responded to a call which asserted that the appellant was "pounding on the door and refusing to leave." When they called out "stop, police" Pennington continued to run until he was caught and knocked down and subdued and thereafter arrested by officers who noted that he "smelled of alcohol, staggered, and his speech was slurred and his eyes were glassy." That court found that there was no evidence that appellant "was placing himself at risk by running, other than he was running in a bad neighborhood. We find such evidence is legally insufficient to sustain a conviction under the subsection of O.R.C. § 2917.11 charged in the case *sub judice*." Although there was in the judgment of that court insufficient evidence of disorderly conduct, the court of appeals found nonetheless that Pennington's arrest was lawful: "when applying the objective test, to the facts in the instant appeal, based upon the nature of the trouble call, the time of the day, and the personal observations of the officers at the scene, we find a reasonable police officer would have believed appellant's conduct constituted a violation of O.R.C. § 2917.11(A)(2). Despite our decision in I, *supra*, there was insufficient evidence of disorderly conduct by intoxication as charged in the complaint, we find the appellant's arrest was nonetheless lawful."

*Id.* at 123.

The majority studiously avoids consideration of McCurdy's abusive language in their consideration of probable cause under the statute. Yet, as noted in *State v. Butler*, 578 N.E.2d 485 (Ohio App. 1989), a defendant's use of profanity may be considered for purposes of determining disorderly conduct under the statute. *Butler*, 578 N.E.2d at 488. In *Butler* the court found the evidence sufficient to support a conviction under R.C. § 2917.11(B)(1), the section regarding offensive conduct as opposed to a risk of harm. The evidence presented was similar to the evidence in this case: the defendant smelled of alcohol, had slurred speech, talked very loudly, berated the police, was very antagonistic towards the officers, and used profanity towards the officers. 578 N.E.2d at 486-87.

Officers must be tolerant of abusive language. Nevertheless, McCurdy's abusive language (and make no mistake about it, it was abusive from the start), even if protected by the First Amendment generally, was nonetheless belligerent. Given the overall circumstances it could reasonably have induced an officer in Cole's position to conclude under Ohio law, as it was then known, that there was a risk of actual harm. The objectively reasonable police officer, which is our measure here, certainly had a right to consider such language not only as indicative of McCurdy's intoxication, but also of his frame of mind. There are happy drunks and there are mad drunks. Officer Cole could reasonably conclude that McCurdy in his then condition and combative frame of mind, did in fact present the danger requisite under the Ohio statute.

Even assuming that the two unpublished cases cited by the majority might somehow accurately reflect Ohio's interpretation of its statute, they fail to support the majority's construction in any event. In *Jenkins*, the defendant was found passed out and slumped over the steering wheel of a car which was stolen, and was arrested for disorderly conduct under TMC 509.03(b)(2). The court observed that the statute

Cole did not administer any kind of sobriety or coherence tests, his testimony that he smelled "alcohol real strong on him," J.A. at 163, coupled with McCurdy's admission that he consumed alcohol both during his nephew's party and the card game at his apartment, provided him with probable cause to believe that McCurdy was "voluntarily intoxicated" under O.R.C. § 2917.11(B)(2).

However, the jury's finding under the second prong of O.R.C. § 2917.11(B)(2) presents a much different question, and we find that no reasonable jury could conclude that Officer Cole had probable cause to believe that McCurdy presented a risk of physical harm either to himself, others, or the property of others. On this issue, Officer Cole testified that:

> [W]hen a person is intoxicated to that level, to my training and experience, under law, they essentially become my responsibility once I become in contact with them. If I let that person go, I cannot tell you what's going to happen to them. I can only, unfortunately, *speculate* what could happen to them. That's why it becomes my responsibility to make sure that *one of a million things* does not happen to them . . . .

J.A. at 151-152; Cole Tr. at 180-181 (emphasis added). Moreover, Officer Cole stated that "[b]y exhibiting his intoxicated nature[,] . . . *there was no way that I could tell* at that point that [McCurdy] was not there to do damage to the property of another person that lived in the area. That's why he was arrested." J.A. at 148 (emphasis added). Officer Cole additionally asserted that after he approached McCurdy, McCurdy's associates combatively challenged his authority.

By Officer Cole's own testimony, he did not have probable cause to arrest McCurdy under O.R.C. § 2917.11(B)(2), and the district court therefore erred in denying McCurdy's motion for judgment as a matter of law. Generously granting Officer Cole the benefit of all inferences and doubts, Officer

Cole, at best, presumed that McCurdy presented a risk of harm either to himself, another, or the property of another solely because he appeared to be intoxicated. However, as noted above, the language of the statute clearly provides that intoxication alone does not give rise to a § 2917.11(B)(2) violation. *See Pennington*, 1998 WL 818632 at *1-*2; *Jenkins*, 1998 WL 161190 at *7. In this regard, neither Officer Cole nor the County has cited any objective and articulable facts from which Officer Cole could reasonably infer that McCurdy presented a risk of physical harm under § 2917.11(B)(2).

Indeed, Officer Cole testified essentially that there were no objective facts to trigger probable cause, as he could only "speculate" on the "one of a million things" that might occur if he did not arrest McCurdy. Moreover, Officer Cole stated plainly that he arrested McCurdy because "there was no way that [he] could tell . . . that [McCurdy] was not there to do damage to the property of another person that lived in the area." J.A. at 148. When an officer literally has no idea whether a presumptively law-abiding citizen has violated the law, the Fourth Amendment clearly commands that government let the individual be. Indeed, if anything is clear about the Fourth Amendment, it is this: government may deprive its citizens of liberty when, and only when, it has a viable claim that an individual has committed a crime, and that claim is supported empirically by concrete and identifiable facts. *See Minnesota v. Dickerson*, 508 U.S. 366, 376 (1993); *United States v. Reed*, No. 99-3393, 2000 WL 665398, at *2 (6th Cir. May 23, 2000). Officer Cole did not satisfy these fundamental imperatives, and, accordingly, we reverse the district court's denial of McCurdy's motion for judgment notwithstanding the verdict as it relates to Officer Cole in his individual capacity. Because the district court did not address specifically whether a County custom or policy gave rise either to County liability, *see, e.g., Monell v. New York City Dept. of Social Servs.*, 436 U.S. 659, 689-90 (1978); *Board of County Commsrs. of Bryan County v. Brown*, 520 U.S. 397, 407-08 (1997), or liability against

they did properly reflect Ohio law, they did not do so at the time of the event here. If the officer's culpability is based upon his understanding of Ohio law at the time of the offense, it is totally unfair to conclude that he ought reasonably to have anticipated this would be the law which he should then have obeyed two years before its issuance and which should have prompted him not to act as he did.

The majority might better have looked to published Ohio cases for guidance on interpretation of the Ohio disorderly conduct while intoxicated statute. In *State v. Parks*, 564 N.E.2d 747 (Ohio App. 1990), overruled on other grounds, *State v. Jenkins*, 598 N.E.2d 872 (Ohio App. 1991), the court held that the defendant's act of sitting peaceably in the passenger seat of a car that was parked in a driveway in an intoxicated state did not create the kind of risk of physical harm to himself that was intended to be encompassed by R.C. 2917.11(B)(2). The court rejected the state's argument that the defendant's refusal to get out of the car presented a risk of harm because he might have been injured when the police assisted him out of the car. The court determined that this entirely passive conduct was not the kind of foreseeable consequence envisioned by the statute. *Parks*, 564 N.E.2d at 750.

Under published Ohio law the foreseeability of the risk of harm requires the exercise of professional judgment. In *Knapp v. Gurish*, 541 N.E.2d 121 (Ohio App. 1989), the defendant police officer was sued for failing to arrest an intoxicated person under the statute. The court observed that "the duty to arrest a person for disorderly conduct while intoxicated is necessarily discretionary." *Id.* at 123.

R.C. 2917.11(B)(2) requires that a police officer assess the condition of the intoxicated person and determine whether his condition poses a risk of harm to himself or others. This assessment requires an exercise of professional judgment that is essential to the proper implementation of the statute.

that time of day in an intoxicated condition after having been drinking most of the night, might do, whether he might get in a fight with a third party, whether he might stagger into the street in front of a truck, whether he might fall off a bridge, or as Officer Cole said "any one of a million things."

The majority in this case is requiring a high degree of specificity from the officer to support his conclusion that McCurdy presented a risk of harm. Merely because the officer could not predict which of the million things McCurdy might do does not render the arrest without probable cause. While conviction under the Ohio disorderly conduct while intoxicated statute clearly requires something more than intoxication alone, the evidence required under Ohio case law need not be as specific as the majority contends.

In this latter respect I am particularly concerned about the court's reliance upon *State v. Pennington*, No. 1988CA00137, 1998 WL 818632 (Ohio App. Nov. 16, 1998), and *State v. Jenkins*, No. L-97-1303, 1998 WL 161190 (Ohio App. March 31, 1998). The majority's reliance on these two cases is seriously flawed. Both *Pennington* and *Jenkins* were published two years *after* the incident in question and would not be proper authority for judging Officer Cole's qualified immunity in any event. Second, *Pennington* and *Jenkins* were decisions of an intermediate court of appeals of Lucas County (*Jenkins*) and Stark County (*Pennington*) when in fact this case arose in Hamilton County.

Of even more serious concern, each of the cited cases contain a prominent notice that Rule 2 of the Ohio Supreme Court Rules for the Reporting of Opinions imposes restrictions and limitations on the use of unpublished opinions. Rule 2(G)(2) provides that unpublished opinions are not controlling even in the judicial district in which the opinion was rendered. This impacts upon our decision here in at least two respects. First, neither *Pennington* nor *Jenkins* is acceptable authority for the posture of Ohio's interpretation of the act in question by the very terms of Rule 2. Second, if

Officer Cole in his official capacity, *see, e.g., Hayden v. Combest*, No. 95-5065, 1995 WL 712801, at *1 (6th Cir. Dec. 1, 1995) (unpublished opinion), we remand for further proceedings.[2]

**B.**

McCurdy also contends that the district court erred in granting Officer Cole's motion for qualified immunity on his First Amendment retaliation claim. We review the district court's grant of qualified immunity *de novo*. *See Gardenhire*, 205 F.3d at 310. Qualified immunity shields government officials performing discretionary functions from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We apply a two-step analysis to determine whether a public official is entitled to qualified immunity: first, we determine whether a clearly established constitutional or statutory right has been violated; and second, we ascertain, pursuant to an objective standard, whether the official acted unreasonably in light of the clearly established right. *See Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

---

[2] Additionally, McCurdy claims that the district court erred in not providing the jury with a specific instruction on the meaning of "risk" under O.R.C. § 2917.11(B)(2), nor providing the jury with the specific definition of "risk" provided by McCurdy. First, it appears that McCurdy did not object on this basis at trial, *see* J.A. at 29-39, McCurdy's Rep. Br. at 9, and that therefore we may only review this claim for "plain error." *See EEOC v. EMC Corp. of Mass.*, No. 98-1517, 2000 WL 191819, at *10 (6th Cir. Feb. 8, 2000) (unpublished opinion). In any event, trial courts have broad discretion in formulating jury instructions. *See King v. Ford Motor Co.*, No. 98-5960, 2000 WL 390539, at *9 (6th Cir. Apr. 19, 2000). Because McCurdy has not made a showing that the district court's instructions were either misleading, prejudicial, or unduly confusing, we must reject this claim.

The district court concluded that when Officer Cole acted, it was not clearly established that the First Amendment prohibited an officer from effectuating an otherwise valid arrest if that officer was motivated by a desire to retaliate against the arrestee's assertion of First Amendment rights. We have held that adverse state action "motivated at least in part as a response to the exercise of the plaintiff's constitutional rights" presents an actionable claim of retaliation. *See Bloch*, 156 F.3d at 678 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ v. Doyle*, 429 U.S. 274 (1977)). Since the day the ink dried on the Bill of Rights, "[t]he right of an American citizen to criticize public officials and policies . . . is 'the central meaning of the First Amendment.'" *Glasson v. City of Louisville*, 518 F.2d 899, 904 (6th Cir. 1975) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964)). There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment. *See id.*; *Bloch*, 156 F.3d at 682; *see also Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) ("[T]he First Amendment right to criticize public officials is well-established and supported by ample case law. Furthermore, it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983."); *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990) ("[G]overnment officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely, anyone who takes an oath of office knows – or should know – that much.").

It is well-established then that McCurdy had a constitutional right to challenge verbally Officer Cole's surveillance, and we therefore reverse the district court's grant of qualified immunity to Officer Cole. Because the district court did not address whether McCurdy's arrest was at least partially motivated by protected conduct, we remand for further proceedings.

————————

**DISSENT**

————————

ENGEL, Circuit Judge, dissenting.   I respectfully but strongly dissent. My dissent is based upon several premises which I think are flawed in the majority's rationale.

First, I dissent from the majority's conclusion that "no reasonable jury could conclude that Office Cole had probable cause to believe that McCurdy presented a risk of physical harm either to himself, others or the property of others" and that "generously granting Officer Cole the benefit of all inferences and doubts, Officer Cole at best presumed that McCurdy presented a risk of harm either to himself, another or the property of another because he appeared to be intoxicated." That statement does not fairly represent the record nor Officer Cole's testimony.

The proofs before the court contained objective and credible facts from which a reasonable police officer could find probable cause to believe that McCurdy presented a risk of physical harm under the statute cited. Officer Cole testified that he found McCurdy outside at 5:00 a.m. He and his companions were not only intoxicated, but also acted as if they wanted to fight the police officer and perhaps each other. He testified that McCurdy used profanity when speaking to him.   Based McCurdy's intoxication, his unprovoked disorderly mannerism toward the officer, and the time of day, the officer concluded that he presented a risk of harm to himself.  The jury agreed.

The majority focuses on Officer Cole's testimony he could only "speculate" on the "one of a million things" that might occur if he did not arrest McCurdy. Bear in mind "one of a million things" is not the same as "one in a million" chance that he might do injury to himself and others. How could any police officer know exactly which particular injury a man at

Officer Cole on McCurdy's First Amendment retaliation claim, as it was clearly established at the time Officer Cole acted that he could not retaliate against McCurdy for asserting his First Amendment rights. With these rulings, we **REMAND** to the district court for further proceedings on McCurdy's Fourth Amendment claim against the County and his First Amendment retaliation claim.

## C.

McCurdy finally asserts that the County improperly used a peremptory challenge to exclude a black juror in violation of the Equal Protection Clause. McCurdy specifically objects to the County's use of a peremptory to strike African-American Sylvia Williams from the jury. In response, the County contends that Williams' demeanor during voir dire suggested that she was disinterested in serving as a juror. In the district court, the County's attorney stated:

> [I]n my view in watching [Williams], there was no response to any of the questions, no nodding of the head. I just took it that she wasn't interested in the case, and I had her crossed off from the beginning, Judge, as far as not being responsive, and that's my reason for exercising . . . the peremptory challenge.

J.A. at 103. Without questioning Williams, or engaging in a colloquy with either McCurdy's or the County's counsel, the district court overruled McCurdy's *Batson* objection. *See* J.A. at 104. In McCurdy's new trial motion, he reiterated his challenge to the peremptory. The district court rejected his renewed challenge, concluding that Ms. Williams was "passive" in the face of the parties' questioning and that the County therefore had articulated a race-neutral justification for its exercise of the peremptory.

A district court's ruling on whether the exercise of a peremptory challenge violates equal protection is entitled to "great deference," and we may not disturb its judgment unless it is clearly erroneous. *United States v. Buchanan*, No. 98-1353, 2000 WL 730235, at *3 (6th Cir. May 22, 2000). It is settled that the Constitution's guarantee of equal protection ensures that a party may not exercise a peremptory challenge to remove an individual on account of that person's race. *See Batson v. Kentucky*, 476 U.S. 79 (1986); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 630-31 (1991) (extending *Batson* rule to civil trials). To establish a equal

protection violation under *Batson*, the claimant must first establish a *prima facie* case of racial discrimination. *See United States v. Mahan*, 190 F.3d 416, 424 (6th Cir. 1999). If the claimant establishes a *prima facie* case, the party exercising the peremptory must proffer a race-neutral explanation. *See id.* This non-racial explanation "need not be particularly persuasive, or even plausible, so long as it is neutral." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). After the defending party offers its race-neutral justification, the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation. *See id.* As with discrimination claims generally, the ultimate burden of persuasion always rests with the party challenging the peremptory. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995).

While body language and demeanor are permissible race-neutral justifications for the exercise of a peremptory, *see United States v. Changco*, 1 F.3d 837, 840 (9th Cir. 1993) ("[P]assivity, inattentiveness, or inability to relate to other jurors [are] valid, race-neutral explanations for excluding jurors."), district courts nevertheless must "explicitly adjudicat[e] the credibility of the non-moving or challenging party's race neutral explanations." *Jordan v. LeFevre*, 206 F.3d 196, 200 (2d Cir. 2000); *see United States v. Perez*, 35 F.3d 632, 636 (1st Cir. 1994) (holding that the trial court must assess the credibility of the race-neutral explanation). The need for an explicit, on-the-record analysis of each of the elements of a *Batson* challenge is especially important when the purported race-neutral justification is predicated on subjective explanations like body language or demeanor. *See United States v. Ledford*, No. 96-5659, 1997 WL 659673, at *2 (6th Cir. Oct. 22, 1997) (unpublished opinion) (noting that crediting subjective explanations for peremptory strikes could allow an improperly motivated attorney to "circumvent" *Batson*). Because the primary defense to pretext based violations of *Batson* is the district court's ability to assess the credibility of an attorney's representations, it is critical that the district court independently assess the proffered

justifications. *See Hernandez v. New York*, 500 U.S. 352, 365 (1991).

Here, because the district court did not merely credit the explanation of the County, but itself found that Williams was passive and disinterested, we conclude that McCurdy has not demonstrated that the district court clearly erred in dismissing his *Batson* challenge. Nevertheless, we underscore that the district court's initial reaction to McCurdy's *Batson* claim, in which it perfunctorily accepted the County's race-neutral explanation, *see* J.A. at 104,[3] did not conform to the requirement that the district court make expressed findings on each of the elements of a *Batson* claim. *See Jordan*, 206 F.3d at 200. It was not until McCurdy's post-verdict motion for new trial that the district court made its own findings pertaining to Williams' demeanor, and thereby complied with the requirements of *Batson*. Given that we grant "great deference" to the district court's *Batson* findings, *see Buchanan*, 207 F.3d at 350, and that the court ultimately engaged in the constitutionally required analysis, we affirm the district court's denial of McCurdy's *Batson* claim.

### III.

Because no rational jury could find that Officer Cole had probable cause to arrest McCurdy under O.R.C. § 2917.11(B)(2), we **REVERSE** the district court's denial of McCurdy's motion for judgment notwithstanding the verdict, and enter judgment for McCurdy on his Fourth Amendment claim against Officer Cole in his individual capacity. We also **REVERSE** the district court's grant of qualified immunity to

---

[3]The district court itself appears to have recognized that its initial disposition of McCurdy's *Batson* challenge was insufficient. In addressing McCurdy's post-verdict new trial motion, the court explained that it did not more probingly assess the County's race-neutral justification because "no one suggested [it] at the time and it would have been an improper intrusion on [Defendant's counsel's] judgment." J.A. at 39.