*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0371P (6th Cir.)
File Name: 03a0371p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 02-3583

SHAWN JACKSON,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 01-00070—Walter H. Rice, Chief District Judge.

Argued: September 11, 2003

Decided and Filed: October 20, 2003

Before: NELSON, GIBBONS, and SUTTON, Circuit
Judges.

---

**COUNSEL**

**ARGUED:** Richard W. Smith-Monahan, OFFICE OF THE
FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for
Appellant. Mona Guerrier, UNITED STATES ATTORNEY,
Dayton, Ohio, for Appellee. **ON BRIEF:** Richard W. Smith-
Monahan, OFFICE OF THE FEDERAL PUBLIC
DEFENDER, Cincinnati, Ohio, for Appellant. Mona

Guerrier, UNITED STATES ATTORNEY, Dayton, Ohio, for
Appellee.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. Defendant-
appellant Shawn Jackson was convicted of one count of post
office robbery in violation of 18 U.S.C. § 2115. During jury
selection, the government exercised a peremptory challenge
to exclude Anthony Turner, who at the time was the only
African-American on the jury panel. Jackson did not object
to the government's decision to strike Turner until the jury
and two alternates were selected. The district court asked the
government for an explanation for its decision to strike
Turner, and Jackson did not argue that the proffered
explanation was a pretext for discrimination. The district
court found that the government offered a race-neutral
explanation and overruled Jackson's objection. Jackson now
appeals this ruling, as well as the district court's refusal to
give the jury instructions he requested regarding his theory of
the defense and the reliability of certain identification
testimony offered at his trial. For the following reasons, we
affirm the judgment of the district court.

**I.**

On August 28, 2001, Jackson was indicted by a federal
grand jury in the Southern District of Ohio for one count of
post office robbery in violation of 18 U.S.C. § 2115. The
indictment alleged that on May 24, 2001, Jackson robbed a
United States post office in Dayton, Ohio, of approximately
$1,333.00. Jackson's trial began on November 5, 2001.
During voir dire, the district court asked the potential jurors
to indicate if they had ever been government employees, and
if so, whether their government service would affect their
ability to serve as a juror. Anthony Turner, juror number 41,

responded by saying, "I served in the United States Air Force for twenty years. And that would not affect my participation in the court." The government did not ask Turner any follow-up questions to his response.

Nonetheless, the government later exercised a peremptory challenge to exclude Turner. At the time, Turner was the only African-American on the jury panel. Jackson did not raise an objection to the government's peremptory challenge until after the jury and two alternates were selected. Counsel for Jackson did not object earlier because he believed that Turner had no chance of being on the panel, but once the selection process was over it became clear that Turner would have been an alternate if the government had not struck him from the panel. In accordance with the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79 (1986), the court asked the government to give its reasons for the challenge. In response, Assistant United States Attorney Richard Chema stated that:

> The gentleman was unresponsive . . . to a question of the Court. The Court asked . . . if anyone had been involved in the government and [would that] in some way affect your ability to serve on the jury. He stood up and said, he was in the Air Force for 21 years and retired from the Air Force and that wouldn't affect him.

> Counsel for the government, both Miss Guerrier and myself believe that this gentleman wanted to get up and give a speech for one reason or another. The government didn't like the kind of attitude that we believe he was putting forth and his demeanor. That's the reason the strike was made.

Jackson did not object to the government's proffered explanation, nor did he argue that it was a pretext for discriminatory animus. The district court concluded that the government had offered a legitimate, non-discriminatory reason in response to Jackson's *Batson* challenge, and

Jackson did not object to that ruling or request a more detailed record of the judge's rationale.

On the third day of trial, the government revisited the issue of Jackson's *Batson* objection in a conference with the district court judge. The government's lead counsel, Mona Guerrier, volunteered that she was the one who initially felt uncomfortable with Turner's demeanor and she also indicated for the record that she is an African-American. The court indicated that her explanation could not be considered because it was being offered three days into the trial. Once again, at the conclusion of the government's comments, Jackson made no additional objections or arguments with respect to the *Batson* issue.

The evidence presented at trial established that on the day of the robbery, Jackson went to the Dayton post office with his girlfriend's brother, Tim Anderson. While in the post office, Jackson observed a transaction involving approximately $1,900.00. As he was leaving, Jackson told Anderson that he had "cased [his] spot." According to Anderson, at the time Jackson was wearing a dark-colored windbreaker, dark pants, white tennis shoes, and a baseball cap with a New York logo on it. After visiting the post office, Jackson borrowed a red and white bicycle from his friend Tony Harris.

Barbara Barnett, a postal clerk, testified that on May 24, 2001, a black male between the ages of eighteen and twenty, wearing a New York baseball hat and a dark jacket approached the counter and gave her a note stating, "Hand me your cash. I have a gun." She then "looked at him in the eyes and said, 'Are you sure you really want to do this?'" The robber became angry and leaned toward her and said "give me the damn cash." During this exchange, Barnett noticed that the robber had a gap between his front teeth. Barnett then gave him the cash from her drawer.

Shortly after the robbery, Barnett viewed a photo line-up and identified Jackson as the robber. Barnett indicated that she was sixty to seventy percent sure of her identification. At trial, Barnett again identified Jackson as the robber. During her testimony, Jackson was asked to smile and expose his teeth to Barnett and the jury, and Barnett confirmed that Jackson had a gap between his front teeth.

The government produced additional eyewitness testimony that was incriminating to Jackson. Brian Butterbaugh, the other postal clerk on duty on the day of the robbery, testified that he observed a gap between the robber's two front teeth when the robber approached his window at the post office. Catherine Green, a customer who was at the post office on the day of the robbery, testified that she saw a red bike by the door of the post office when she entered. Green further testified that she had observed a black male wearing a dark jacket and a dark hat reposition himself at the back of the line several times for no apparent reason. After completing her transaction at the postal window, she observed the same man exiting the post office, and she saw him jump on the red bicycle and ride away very fast. She also identified Jackson as the man she saw at the post office riding away on the bike. Several of Jackson's acquaintances testified that Jackson had a gap between his front teeth. Jackson's girlfriend testified that he owned clothes matching the description provided by the postal clerks and confirmed that he was wearing those clothes on the day of the robbery. During the course of the trial, the government presented additional circumstantial evidence suggesting that Jackson had committed the robbery.

At the close of the trial, Jackson submitted several proposed jury instructions. Specifically, Jackson requested the following instruction on his theory of defense:

> The defense says that Shawn Jackson was misidentified as the robber of the post office by the witnesses who were there that day. The defense further says that the

> acquaintances of Shawn Jackson had motivations which show they were being untruthful.

The district court declined this request because it found that the instruction was unnecessary and not required by law.

Jackson also requested the following instruction regarding some of the identification testimony that had been offered at his trial:

> You have heard the testimony of Barb Barnett and Catherine Green, who have identified the defendant as the person who robbed the post office. You should carefully consider whether this identification was accurate and reliable.

The proposed instruction also set forth factors that Jackson wanted the jurors to consider in determining whether the identification was accurate and reliable. The district court again declined to give the instruction, stating: "My concern is that I think the accuracy of the identification can be argued under credibility. I don't think a separate instruction is necessary." The court did provide a general instruction to the jury on assessing the credibility of each witness:

> Consider carefully the circumstances under which each witness testified. Remember the witness's response to questions, his or her assurance or lack of it in answering, and the entire demeanor or appearance of that witness while on the witness stand.

> Consider also any relation that a witness may bear to either side of the case and his or her reasons for testifying, any interest he or she may have in the outcome of the case. Any prejudice or bias he or she may have shown including any reason or motivation to bear hostility or animosity toward a party and any partiality he or she may have demonstrated.

On November 9, 2001, the jury returned a guilty verdict. On May 15, 2002, the district court sentenced Jackson to ninety-six months incarceration, three years supervised release, and one hundred hours of community service. In addition, Jackson was ordered to pay restitution to the United States Postal Service in the amount of $613.00 and a special assessment of $100.00. On May 21, 2002, Jackson filed this timely appeal.

## II.

### A. Jackson's *Batson* Objection

Jackson argues that the government violated his right to equal protection when it used a peremptory challenge to strike Turner, the only remaining African-American member of the jury panel. After counsel for Jackson raised a *Batson* objection to the government's peremptory challenge, the district court required the government to state its reasons for excluding Turner on the record. Counsel for the government indicated that he struck Turner from the panel because he did not like his demeanor and "attitude." The district court concluded that the government had offered a legitimate, non-discriminatory reason for the challenge and overruled Jackson's objection.

The Equal Protection Clause prohibits a party from using peremptory challenges to exclude members of the venire on account of their race. *Batson v. Kentucky*, 476 U.S. 71, 79 (1981); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 630-31 (1991) (extending *Batson* to civil cases). In order to establish an equal protection violation under *Batson*, the complaining party must first make a *prima facie* showing that the peremptory challenge was based on race. *McCurdy v. Montgomery County*, 240 F.3d 512, 521 (6th Cir. 2001). If the complaining party establishes a *prima facie* case, the burden of persuasion then shifts to the party making the strike to articulate a race-neutral explanation for removing the juror in question. *Id.* This explanation "need not be particularly

persuasive, or even plausible, so long as it is neutral." *Id.* at 521 (citing *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999)). Once a race-neutral explanation is produced, the complaining party must prove purposeful discrimination. *Batson*, 476 U.S. at 98. Purposeful discrimination may be shown by demonstrating that the proffered explanation is merely a pretext for racial motivation. *McCurdy*, 240 F.3d at 521. Throughout the *Batson* inquiry, the ultimate burden of persuasion always rests with the party challenging the strike. *Id.*; *see also United States v. Mahan*, 190 F.3d 416, 424 (6th Cir. 1999). A district court's ruling on whether the exercise of a peremptory challenge violates equal protection is entitled to great deference and will not be reversed unless it is clearly erroneous. *United States v. Buchanan*, 213 F.3d 302, 308-09 (6th Cir. 2000).

In the instant case, the district court asked the government for an explanation for its decision to strike Turner without considering whether Jackson had established a *prima facie* case.[1] However, once a party offers a race-neutral explanation for a peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, "the preliminary issue of whether the defendant [has] made a *prima facie* showing of intentional discrimination becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991); *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 780 (6th Cir. 2003). Thus, we need not consider whether Jackson has established a *prima facie* showing that the peremptory challenge was based on race.

The second step in the *Batson* inquiry is to assess whether the government articulated a race-neutral explanation for its decision to strike Turner from the panel. A district court must

---

[1] In *Mahan*, however, this court held that a party's use of a peremptory challenge to strike the only prospective black juror was "more than sufficient to establish a *prima facie* case of intentional discrimination." 190 F.3d at 424-25.

independently assess a race-neutral explanation and explicitly rule on its credibility, "particularly in cases when the purported race-neutral justification is predicated on subjective explanations like body language or demeanor." *McCurdy*, 240 F.3d at 521. It is inappropriate for a district court to perfunctorily accept a race-neutral explanation without engaging in further investigation. *Id.* at 520-21. However, "it is the defendant's burden to rebut, to whatever extent possible, the prosecutor's reasons for exercising his or her peremptory strikes on the record at the time such reasons are proffered." *United States v. Harris*, No. 00-3474, 2001 WL 873642, at *3 (6th Cir. July 26, 2001). If a defendant fails to rebut a race-neutral explanation at the time it was made, the district court's ruling on the objection is reviewed for plain error,[2] *United States v. Wilson*, No. 99-2280, 2001 WL 549446, at *2 (6th Cir. May 14, 2001), and the movant in this setting is in no position to register a procedural complaint that the district court failed to give a specific reason on the record for accepting the government's race-neutral explanation. A movant's failure to argue pretext may even constitute waiver of his initial *Batson* objection. *Davis v. Baltimore Gas & Elec. Co.*, 160 F.3d 1023, 1027 (4th Cir. 1998); *United States v. Contreras-Contreras*, 83 F.3d 1103, 1105 (9th Cir. 1996); *Hopson v. Frederickson*, 961 F.2d 1374, 1377 (8th Cir. 1992); *United States v. Rudas*, 905 F.2d 38, 41 (2d Cir. 1990).

The district court concluded that the government had come forward with a legitimate, non-discriminatory reason for its peremptory challenge, and Jackson did not object to the

---

[2] When an appellant fails to make an objection in the trial court, the objection is deemed forfeited, and thus non-cognizable upon appellate review, unless the assailed action of the trial court constituted plain error. Fed. R. Crim. P. 52(b). To establish plain error, the appellant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected an appellant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).

court's ruling or attempt to rebut the government's proffered explanation by arguing that it was a pretext for discrimination. On appeal, Jackson argues that the totality of the information available to the district court at the time the strike was made indicated that the government's peremptory challenge was based on a discriminatory purpose. Specifically, Jackson now objects to the district court's failure to weigh the credibility of the government's explanation on the record. He also argues for the first time on appeal that the proffered explanation lacked credibility because the government failed to strike similarly-situated white jurors. Because Jackson failed to rebut the government's explanation at the time it was made, we review the district court's ruling on his objection for plain error.

A peremptory challenge is not unconstitutional solely because it has a racially disproportionate impact. Some proof of racially discriminatory intent or purpose is required in order to show a violation of the Equal Protection Clause. *Hernandez*, 500 U.S. at 360 (citing *Arlington Heights v. Metro. Hous. Dev. Co.*, 429 U.S. 252, 264-64 (1977)). In the *Batson* context, a party's explanation for its decision to strike is "neutral" if it is based on something other than the race of the juror. *Id.* In the absence of discriminatory intent inherent in the explanation, the reason offered is deemed race neutral. *Id.*

There was no evidence of discriminatory intent inherent in the government's proffered explanation in this case, and Jackson made no attempt to argue to the district court that the explanation was a pretext for discrimination. Furthermore, Jackson has not asserted any arguments on appeal that suggest the district court plainly erred by overruling his objection. Jackson contends that the government's failure to strike similarly-situated white jurors from the panel should have signaled to the district court that the government had a discriminatory purpose when it struck Turner from the panel. In fact, all of the "similarly-situated" white jurors Jackson points to in his brief were responding to a different question

from the one Turner was answering when he made the statement that caused the government to object to his presence on the panel. Turner was responding to a question about previous government employment, while the jurors cited in Jackson's brief were responding to questions about their experiences with law enforcement. Jackson did not attempt to rebut the government's explanation by offering additional evidence and did not otherwise indicate a continuing objection. The district court could have construed Jackson's failure to respond to the government's explanation as an indication that he no longer disputed the strike. *See Rudas*, 905 F.2d at 41. The burden was on Jackson as the party challenging the strike to prove the existence of purposeful discrimination, and when faced with the government's seemingly race-neutral explanation, Jackson made no response. Under these circumstances, the district court did not plainly err in overruling Jackson's *Batson* objection.

## B. Jackson's Proposed Jury Instructions

Jackson's second contention on appeal is that the district court erred by refusing to provide the jury with instructions on his theory of the defense and on the reliability of identification testimony offered at his trial. A district court's refusal to deliver a requested jury instruction amounts to reversible error only if the instruction (1) is a correct statement of the law; (2) was not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense. *United States v. Gibbs*, 182 F.3d 408, 432 (6th Cir. 1999).

At the close of the trial, Jackson asked the district court to instruct the jury that "[t]he defense says that Shawn Jackson was misidentified as the robber of the post office by witnesses who were there that day" and that "the acquaintances of Shawn Jackson had motivations which show they were being untruthful." Counsel for Jackson repeatedly emphasized these theories to the jury throughout the entire trial, beginning

with his opening statement that "this case is really about mistaken identity and hidden motivations." During cross-examination, defense counsel questioned the government's witnesses at length regarding how much time each had spent actually looking at the defendant, the distance at which each of them had viewed the defendant, and any distractions or memory lapses that might have impacted their observations. When defense counsel gave his closing argument, he spent considerable time emphasizing these same points, as well as the defense's theory that the government's witnesses had mistaken Jackson for Tony Harris on the day of the robbery. The district court specifically instructed the jury to consider "any bias or prejudice" a witness may have had when testifying, including "any reason or motivation to bear hostility or animosity toward any party." In short, the failure to give this instruction did not substantially impair Jackson's defense because the jury was already well aware of his theory of the case. *See United States v. Covington*, 2001 WL 302067, at *2 (6th Cir. March 21, 2001); *United States v. Laury*, 49 F.3d 145, 152 (5th Cir. 1995).

Jackson also requested more detailed instructions on identification testimony, including a set of factors for the jury to use in determining whether an identification is accurate and reliable. The district court overruled Jackson's request and gave the jury a general credibility instruction to consider "the circumstances under which each witness testified," as well as the "entire demeanor or appearance" of each witness. Identification instructions are within the discretion of the trial court; they need only be given if there is a danger of misidentification due to a lack of corroborating evidence. *United States v. Boyd*, 620 F.2d 129, 131-32 (6th Cir. 1980). Jackson's identification was not uncorroborated. Two eyewitnesses identified him as the robber, and evidence was presented indicating that on the day of the robbery he was wearing the same clothes as those worn by the culprit and that he had possession of a bicycle matching the description of the one used by the robber when he left the post office. Once again, defense counsel discussed at length throughout the trial

the accuracy and reliability of the identification testimony offered by the government, so it cannot be said that the district court's failure to give Jackson's proposed instruction substantially impaired his defense.

### III.

For the foregoing reasons, we affirm the judgment of the district court.