NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0402n.06

No. 18-2341

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| VENESSA MEIRS, Personal Representative of the Estate of Scott Meirs, | ) ) ) | **FILED** <br> Jul 13, 2020 <br> DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE |
| OTTAWA COUNTY, et al., and CORRECT CARE SOLUTIONS, LLC, | ) ) ) | WESTERN DISTRICT OF MICHIGAN |
| Defendants-Appellees. | ) | |

BEFORE:    DAUGHTREY, KETHLEDGE, and THAPAR, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Plaintiff Venessa Meirs brought this civil rights action under 42 U.S.C. § 1983 after her husband, Scott Meirs, committed suicide while detained in the Ottawa County (Michigan) jail. The complaint alleged that he received constitutionally inadequate medical treatment from three Ottawa County deputies and the jail's medical provider, Correct Care Solutions (CCS).  The district court granted summary judgment to Ottawa County and CSS, based on *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and the case proceeded to trial against the deputies.  Following a verdict in favor of the defendants, Venessa Meirs appeals the district court's grant of summary judgment and several decisions of the district court made during trial, including a challenge to jury selection and various evidentiary rulings.  For the reasons that follow, we affirm.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

On August 4, 2013, Scott Meirs was arrested for entering a neighbor's house and stealing pills. He was brought to the local jail, screened by a booking officer, cleared for the general population, and put in a cell with a medical referral. The next morning, Rachel Lindemulder, a nurse employed by CCS, saw Scott for a routine health assessment. During that assessment, Scott told the nurse that his current medications included methadone and gabapentin, a drug known to treat pain associated with neuropathy. Scott denied any history of mental health issues, substance abuse, or suicidal ideation. Although he had indicated during a previous jail stay that he was suicidal and addicted to heroin, nurses generally did not check into the inmates' medical history until the full intake examination that would occur up to 14 days later. Because of Scott's methadone use—and the jail's policy against distributing methadone to inmates—the nurse placed him into a withdrawal program. In accordance with CCS policy, she called Scott's pharmacy to confirm his prescriptions and learned that he had not picked up medication there since the prior year. She then faxed her supervising physician to inquire about restarting Scott on Gabapentin and something to replace the methadone for pain relief.

Nursing staff checked Scott three times a day for withdrawal symptoms. Two days later nurse Megan Vink cleared him for the general jail population and placed him into the M-Pod. That night, Scott filled out a jail kite[1] claiming that he called for medical assistance and that the deputy declined the request. Scott did not select the form's option to have that kite sent to medical personnel, however, so the medical staff never saw it.

---

[1] A "kite" is a form that allows inmates to communicate and get information about "just about anything," including court dates, visitors, lawyers' information, requests, complaints, or medical assistance.

The next morning, nurse Mindy Navis saw Scott for complaints of abdominal pain. She determined that immediate treatment was unnecessary but requested that a doctor evaluate Scott the next day. Upon return to the M-Pod, Scott acted in an agitated manner, displayed a "negative attitude," and complained to other inmates about his medication. He also submitted a medical kite stating, "I have requested 4x to up my [Neurontin] from 400 mg to 1500 mg. Also antidepressant Valaxin 75 mg. VA Dr. ordered. Ultram for pain." It is unclear when he filled out the kite, however, as the jail collects kites only once a day in the morning.

During free time, Scott confessed to several other inmates that he planned to kill himself. Although it is clear that Scott asked when inmates were to receive razors, apparently intending to cut himself, it is less clear whether he indicated that he would commit suicide "the first chance he got." Next, Scott approached the officers' control room and peered in, putting his face up to the glass and cursing at the officers. When Scott failed to comply with an order to back away, deputy Eugene Murin directed Scott to return to his cell for early lockdown.

After Scott was locked in his cell, at about 9:00 p.m., deputy Linda Cashman went to the M-Pod to conduct her rounds. She noticed that Scott had left his washed socks and underwear in the common area, so she took them to his cell and placed them on his desk. At that time, Scott appeared to be asleep, under the covers and facing the wall. When she exited the cell, four other inmates, including Robert Dalman, approached her to relay Scott's earlier suicide threat.

It is unclear exactly what Dalman conveyed to Cashman but, at a minimum, he told her that Scott was inquiring about when the inmates received razors and saying that he intended to kill himself. She asked the inmates if they'd be willing to fill out a statement reporting this information, and they indicated that they would. When Cashman returned to Scott's cell and opened it, Scott rolled over to face her and asked if the inmates were locked down for the rest of

the evening. Cashman told Scott that he was on lock down for another hour because of his earlier infraction and that she had put his washed items in his room. He thanked her, then rolled over to face the wall. Cashman later reported that she also asked Scott, "What's the deal?"—hoping that he would confide in her. She did not ask him directly if he intended to commit suicide, fearing it would prompt him to change his plan and injure himself sooner than he intended. Cashman decided that the threat was not imminent because inmates receive razors only on Sundays and Wednesdays, the earliest of which was three days away. She also recalled learning that if someone who is suicidal has a plan, they usually stick to that plan.

Cashman returned to the control room and shared the information on Scott's suicide threat with deputies Murin and Joseph Dirette. They agreed with her assessment that it was best to leave Scott in his own cell for the night. Cashman then pulled the forms for inmates to document their statements, started a report, but then got called away to go to booking for another task. No additional follow-up occurred that evening, other than the standard rounds of cell-checks conducted every 55- 60 minutes.

At about 1:44 a.m., Dirette was making his rounds and discovered Scott hanging by his bedsheet from a shelf in his cell. He called for assistance from all other officers, entered Scott's cell, released him, and administered CPR. CPR protocols were continued until emergency medical personnel arrived and transported Scott to the hospital. At the hospital, Scott was placed on life support, but his family made the decision to remove him from life support four days later, leading to his death.

Jail officials then called on Detective Kreg Brace and requested a "death investigation" to "rule out foul play." Brace conducted a series of interviews with jail personnel, inmates, and healthcare workers. He ultimately confirmed that Scott's death was a suicide.

Two years later, plaintiff Venessa Meirs, as representative of Scott Meirs's estate, filed suit under 42 U.S.C. § 1983 alleging deprivation of her husband's rights under the Fifth and Fourteenth Amendments. She alleged that the actions of the defendants—Ottawa County, CCS, Cashman, Dirette, Murin, Navis, and Lindemulder—constituted deliberate indifference to Scott's known, serious medical needs and argued that *Monell* liability should apply to Ottawa County and CCS. Ottawa County moved for summary judgment on all claims against it and the deputies. CCS moved for summary judgment on claims against the company and the nurses it employed. Ultimately, the district court granted summary judgment in favor of CCS, the County, and nurses Navis and Lindemulder. It concluded that there were genuine issues of material fact that precluded summary judgment for deputies Cashman, Murin, and Dirette. The plaintiff's case against the deputies proceeded to trial. In advance of trial, both sides filed motions *in limine* to exclude certain evidence. Of note, the defendants moved to exclude (1) "any allegations about any alleged deficiencies" in the policies or procedures of the jail; (2) comments or questions regarding the alleged statements made by inmates; and (3) the jail kite in which Scott complained that the "bald" officer refused to assist with his medical needs. The plaintiff sought to exclude, among other things, information regarding the felony conviction of one of the inmates who spoke with Cashman about the threat of suicide.

The district court ruled that the parties were precluded from introducing evidence on the deficiencies of the dismissed parties' policies and procedures but reserved a ruling regarding testimony on "whether the remaining Defendants followed jail policy." The district court denied the request to preclude introduction of evidence regarding the felony conviction of inmate Dalman but limited such evidence to "the mere fact of conviction—without further substance likely to

prejudice the jury." The court further granted the motion to exclude the investigative report that included the inmates' statements and reserved ruling on the admission of the jail kite.

The entire jury venire included four African Americans but only two were involved in the voir dire, and the defense excused both of them peremptorily. The plaintiff challenged the second strike under *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court conducted a *Batson* hearing but ultimately overruled the challenge.

In the end, the jury concluded that none of the defendants should be held liable for violation of Scott's constitutional rights, and the district court entered judgment in their favor. The plaintiff now appeals that judgment.

## II. DISCUSSION

### A. Deliberate Indifference

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citations omitted). Under the Fourteenth Amendment, "pretrial detainees have a right to adequate medical treatment that is analogous to the Eighth Amendment rights of prisoners." *Watkins v. City of Battle Creek*, 273 F.3d 682, 685–86 (6th Cir. 2001) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Establishing a violation of this right requires a showing "that the defendants acted with 'deliberate indifference to serious medical needs,'" *id.* at 686 (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), including psychological needs. *Perez v. Oakland Cty.*, 466 F.3d 416, 423 (6th Cir. 2006) (citing *Estelle*, 429 U.S. at 103-4). A pre-trial detainee's suicidal tendencies can constitute "serious medical needs," and "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence

of [those tendencies] is essential to a finding of deliberate indifference." *Horn ex rel. Parks v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted).

A finding of deliberate indifference has both subjective and objective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective element looks to whether the medical need is "sufficiently serious" and is satisfied by evidence that a prisoner exhibited suicidal tendencies. *Comstock v. McCrary*, 273 F.3d 693, 704 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 834). "To satisfy the subjective component, the plaintiff must allege facts that, if true, would show that the [defendant] subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.* at 703 (citing *Farmer*, 511 U.S. at 837). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" is insufficient to be condemned as a constitutional violation. *Farmer*, 511 U.S. at 838.

**B. Summary Judgment in Favor of Defendants Ottawa County and CCS.**

We review a district court's summary judgment rulings *de novo* and must view all facts in the light most favorable to the non-moving party. *Hartman v. Thompson*, 931 F.3d 471, 478 (6th Cir. 2019) (citing *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018)). Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of proving that there is no genuine issue of material fact is generally on the moving party, but "that burden may be discharged by 'showing . . . that there is an absence of evidence to support the nonmoving party's case.'" *Bennett v. City of Eastpointe*, 410 F.3d 810, 819 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Local governing bodies, like municipalities and counties, may be sued for constitutional violations that are the result of "a policy statement, ordinance, regulation, or decision officially

adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. "Although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible" for the constitutional violation, plaintiffs also may sue governments "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91. A local governing body may not, however, be sued simply because they employed an officer who committed a constitutional tort. *Id.* at 691. Municipal liability further requires an "affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

On appeal, the plaintiff argues that the district court erred in granting summary judgment in favor of Ottawa County. She relies on what could be considered two separate approaches to liability under *Monell*. She points first to tolerance, acquiescence, or ratification of unconstitutional conduct by officials with final decision-making authority. *See Doe v. Claiborne Cty. ex rel Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 511 (6th Cir. 1996) (citing *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir. 1984); *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993)). Second, she argues that inadequate training of employees ultimately caused the constitutional wrong. *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989).

Part of the challenge is to the cell checks that were allegedly inadequate because they occurred only "every 55-60 minutes, not staggered, and took a total of less than 2 minutes, with less than one second walking by Scott's cell without actually looking in or even slowing down." An expert offered by the plaintiff testified that the standard in many jails is "flesh and movement," meaning that officers must see a body part and movement of the inmate to satisfy the purposes of the checks, *i.e.*, security and inmate welfare. In general, according to the expert, officers should

perform cell checks every 30, 45, or 60 minutes for the general population, but every 15 minutes for cells where inmates are on suicide watch. The expert described a "best practice" as staggering cell checks by five or ten minutes so that inmates cannot time the checks and predict when they will occur, in order to time action in between checks. The plaintiff does not contend that the actual cell-check policy was inadequate but argues, instead, that the County acquiesced to a practice of insufficient cell checks. But, depositions of the deputies revealed that the County trained the deputies on the importance of staggering cell checks and demonstrated proper cell checks to deputies through the shadowing of a supervisor. Moreover, the record shows that officers staggered cell checks by two-to-five minutes on the night in question, conducting cell checks between 56 and 60 minutes apart. As for the quality of the cell checks, the plaintiff's expert testified that although some of the cell checks done that night were appropriate, many were too short and insufficient in quality.

The plaintiff contends that because the allegedly inadequate cell checks were "subsequently condoned by Captain Steve Baar " and that because Baar testified that "one-second, non-staggered cell checks" were sufficient, we should find that the County ratified the behavior that led to Scott's suicide. Here, however, there is no evidence that Baar's ratification of inadequate cell checks was part of a persistent pattern. Officers were aware of the need to stagger their cell checks and were able to recount the requirements of an adequate check. As a result, the plaintiff has not made a showing that there was a pattern of inadequate cell checks in the past.

Imposing liability on the County also requires demonstration of a link between the ratification of the policies and the suicide. *See Bennett*, 410 F.3d at 819. In arguing that the suicide was a result of the inadequate cell checks, the plaintiff relies upon the amount of time it took Scott to write "three substantive letters . . . and fashion a noose when he should have been sleeping."

But, she has offered no evidence to establish when the notes were written or how long it took to fashion the noose, and there is no evidence that the approach taken led to the failure to notice any activity taken by Scott that would have indicated he was at risk.

The plaintiff also attacks the district court's failure to address her argument that the County's booking and intake processes at the jail were "woefully inadequate to ensure the safety and health of inmates." But she provides no actual evidence to support this position in her brief. At the district court level, this argument relied on the arresting and booking officers' failure to follow the County's intake policy. However, an officer's failure to follow reasonable policies laid out by the County does not support an argument for liability for the County, particularly where there is no evidence of a pattern of the policies leading to suicides by other inmates. *Perez*, 466 F.3d at 432 (holding that such arguments "further suggest a lack of a link between County policy and [the inmate's] suicide").

The plaintiff next argues that the ratification of unconstitutional conduct can be shown by a county's failure to discipline officers, or by its lack of a serious investigation into the reported conduct. *Marchese v. Lucas*, 758 F.2d 181, 182 (6th Cir. 1985). She alleges that although the County conducted a post-incident investigation, it was grossly inadequate and a "sham."

The jail's written procedures require a psychological autopsy, a clinical mortality review, and an administrative review in the case of an inmate's death.[2] The County conducted neither the autopsy nor the mortality review in this case and, further, Baar was unfamiliar with what those procedures were. The only investigation conducted was by Brace, the investigator hired by the County to do a "death investigation." Brace declared the intent of the investigation was to "rule out foul play," and collect documentation with the intention of presenting it to attorneys for

---

[2] These procedures are outlined by Correctional Healthcare Companies, the organization contracted to provide the jail's mental health services.

depositions and for "everybody's wellbeing." In fact, in his investigative interviews, Brace expressed the purpose of the investigation was to "combat[ ] against the possibility of [ ] getting sued" and prepare for a lawsuit. Brace also testified that he was not trained in suicide-prevention practices and was not investigating whether the deputies responded appropriately, whether Scott's suicide could have been prevented, or whether any policies or practices should be changed to prevent similar incidents in the future. Ultimately, the investigation did not produce any type of written report or analysis, just a compilation of interviews conducted. Thus, Baar testified that as a result of the investigation, the only change the jail made was to remove shelves from the cells in M-pod.

We have held in prior cases that the failure to investigate an incident can be evidence of deliberate indifference. *See, e.g.*, *Marchese*, 758 F.2d at 184 (stating that the failure to investigate "served to confirm the existence of an unstated 'policy' of toleration of illegal brutality toward any county prisoner who had threatened the life of a sheriff's deputy"); *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989) (holding that the sheriff's failure to investigate mistreatment and punish those involved "ratified the unconstitutional acts"). However, neither *Marchese* nor *Leach* provide the precedential support the plaintiff seeks to attribute to them. In *Marchese*, the sheriff's deliberate indifference was established by the failure to conduct an investigation after the district court ordered one. *Marchese*, 758 F.2d at 184. In *Leach*, there was a record of approximately 14 other instances of similar abuse in a two-year period. *Leach*, 891 F. 2d at 1247. By contrast, a single instance of a failure to investigate, as alleged here, is insufficient to "infer a policy of deliberate indifference." *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005).

In an effort to establish a pattern of indifference to unconstitutional conduct, the plaintiff points out that another suicide occurred on September 13, 2013, just 35 days after Scott's suicide in the same cell block that Scott was located in, also committed by the inmate hanging himself with a sheet from the shelf in his cell. A similar situation *after* the fact, however, does not create a pattern to show that the County was on notice at the time of the event in question. Although there were two earlier suicides at the jail, the record contains no indication whether there were sufficient investigations conducted after those incidents occurred.

Because in this case it was not the investigation itself that allegedly deprived Scott of constitutional rights, showing a stronger pattern of behavior is required. *See Thomas*, 398 F.3d at 433. The plaintiff has not shown that the failure to conduct a more comprehensive investigation in this case was indicative of a pattern of conduct by the County and that the pattern was the cause of the suicide. *Id.* There is no evidence that the failure to conduct adequate investigations in connection with the 2004 and 2007 suicides resulted in the plaintiff's harm, and therefore her failure-to-investigate argument is without merit.

Nor can the plaintiff establish county liability under *City of Canton*'s failure-to-train theory. To succeed on such a theory, a plaintiff "must prove . . . that the training program at issue is inadequate to the tasks that officers must perform; that the inadequacy is the result of … deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992) (quoting *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)); *City of Canton*, 489 U.S. at 390-91. In other words, a county can be held liable for lack of appropriate training of its deputies when "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the

policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 389.

Here, the plaintiff does not contend that the training itself was inadequate or inaccurate. Instead, she argues that staff did not retain the information contained in the training modules, rendering the training "essentially useless." Because there were no inquiries into whether the officers needed additional training or complied with the training that they were provided, it is irrelevant, the plaintiff argues, that the training content itself was valid. Several of the officers admitted to having little-to-no memory of the suicide-prevention-training materials, either because they might have been "skimmed through," because the training lasted about two hours once a year, or simply because of an inability to remember details. In fact, the three officers questioned all claim to recall learning incorrect information, that if an inmate "ha[s] a plan, they very seldomly veer off their plan."

Without question, it is insufficient for a governing body simply to *offer* training on the topic. To hold otherwise would allow a county to "shield itself from liability for failure to train its police officers in a given area simply by offering a course nominally covering the subject, regardless of how substandard the content and quality of that training is." *Russo*, 953 F.2d at 1047 (reversing a grant of summary judgment to the city where certain required procedures were completely absent from the training). Here, not only were the training materials submitted into evidence and approved by the plaintiff's expert, but, despite the deputies' failure to remember certain details of the training, it appears they retained important information.[3] There was no

---

[3] For example, Cashman testified that she had been trained that prisoners who expressed an intent to kill themselves should not be isolated, to engage in conversation with a suicidal inmate, and that an inmate's denial of suicide risk does not remove the need to act. Cashman and Baar's testimony further established that through Cashman's training, she understood that if she had taken action, protocol would require the inmate to be placed in a different cell without sheets or other items and possibly be given a "suicide smock." But, such protocol, if unwarranted, could be considered punishment under these circumstances.

indication of similar issues that would have put the County on notice of the need for alternative or additional training. To the contrary, the County circulated an updated memo on procedures concerning suicidal inmates in June 2013, just two months before Scott's suicide.

As we explained in *Hays v. Jefferson City*, "a negligent failure to adequately supervise, train or control" is insufficient to establish a defendant's deliberate indifference. 668 F.2d 869, 873 (6th Cir. 1982). It may be clear to the County now, after the trial, that alternative teaching methods should be employed to increase information retention among the officers. But, the County's approach to training on suicide prevention cannot be said to amount to "purposeful non-feasance" that would result in a substantial likelihood that suicide would occur. *Id.* at 873 (citations omitted).

The plaintiff next challenges the grant of summary judgment to defendant CCS, the County's private medical contractor. Ottawa County contracted with CCS to provide medical services to inmates at the jail but, notably, the contract did not include mental health services. The district court granted summary judgment to CCS—and importantly, to the two nurses on staff—holding that because the nurses were entitled to summary judgment, CCS could not be held liable given that *Monell* claims "require an underlying violation before municipal liability can attach."

The first argument against granting CCS summary judgment is that despite the increased need for medical care in jails, the only medical director and physician CCS placed at the jail was Dr. Joseph Natole, who visited the jail just once a week. Due to this inadequate staffing, the plaintiff argues, "violations in corporate policies requiring physician oversight for various medical procedures, was inevitable" and resulted in "the dangerous mismanagement of CCS's opiate withdrawal protocol." She points out that CCS's written intoxication and withdrawal policy specifies that a physician must supervise the gradual detoxification of an inmate. In practice,

however, inmates at the jail were not tapered off methadone but, rather, were deprived of the drug abruptly. Although the plaintiff contends that this process is "inadequate and dangerous," CCS's expert, Kathy Wild, testified that it is normal not to taper methadone use in a jail setting.

These claims might well establish negligence, but they "do[] not show that [CCS] 'consciously expos[ed]' [Scott] to a risk of serious harm," which is required to succeed on a claim of deliberate indifference. *Winkler v. Madison Cty.*, 893 F.3d 877, 893 (6th Cir. 2018) (citing *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)). Deposition testimony did reveal that if the doctor and nurses had known all the relevant information—that an inmate withdrawing from methadone complained of sharp abdominal pain and asked for an increase in pain medication and for an anti-depressant—they would have referred that inmate for an immediate mental-health evaluation. But in reality, no one person had all that information—a result of various actors and policies, including Scott's failure to have his kite with the medication request go to medical staff. Even if a CCS employee had been aware of all this information and still did not act, it is not enough that the entity "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [it] must also draw the inference." *Farmer*, 511 U.S. at 837. The record simply does not show that any CCS employee drew such an inference.

In the alternative, the plaintiff argues that CCS should be held liable, not for its general policies, but for the unconstitutional level of care provided by Dr. Natole. She contends first that, in contravention of jail and CCS policies, Natole prescribed Scott Gabapentin "at a lower dosage than he had been taking, took him off methadone 'cold turkey,' and ignored or refused his request for something to replace the methadone for his pain." Second, the plaintiff contends that Natole's failure to supervise the "detoxification process at all" was in direct violation of CCS's written policy.

In response to the first argument, CCS correctly contends both that "there is no evidence that CCS was aware Natole did not comply with CCS policies" and that the evidence is insufficient to conclude that Natole's acts "were a proximate cause of harm to the Plaintiff and that an unconstitutional policy of CCS was the driving force behind them." The parties do not dispute that when Scott reported his use of methadone and Gabapentin, Lindemulder called his pharmacy to confirm the information and was told that Scott had not filled a prescription from them since 2012. As a result, Natole prescribed Gabaptentin to control Scott's pain but in a dose he thought appropriate. Gabapentin generally is used for pain relief, and although Natole failed to provide Scott with additional pain medication, the doctor did not ignore or refuse his requests for pain medication. As a result, Natole's conduct cannot be considered so deliberately indifferent as to be unconstitutional and justify imposing liability on CCS. Second, because a cold-turkey approach to detoxification in jails is a typical approach without known dangers, using that regimen cannot constitute deliberate indifference—particularly without evidence of a pattern of prior incidents that would have put the jail or CCS on notice of potentially catastrophic consequences.

The plaintiff next insists that CCS should be held liable because it failed to put a suicide-prevention policy in place prior to August 2013. Although under its contract, CCS did not provide mental health services to the jail, it did have a suicide prevention policy in place that it withdrew in January 2013. Because CCS withdrew its suicide-prevention policy "without ensuring an adequate replacement to guide" the staff, the plaintiff contends that CCS was deliberately indifferent to protecting inmates from the known risk of suicide. Depositions of the CCS staff show, however, that they indeed had received information on suicide prevention in multiple formats and were trained in suicide prevention regardless of whether they were obligated to provide mental-health services directly.

The district court determined—and the plaintiff does not contest—that the CCS nurses could not be held liable for Scott's suicide because they did not meet either the objective or the subjective components of a deliberate-indifference claim. The district court found, based on the record and expert Wild's testimony, that the nurses acted "reasonably" by placing Scott in the opioid-withdrawal protocol and that any possible failure to refer him for additional mental-health screenings would amount to medical negligence only. Based on this assessment, even if the medical staff was following an inadequate policy of suicide prevention, there is no evidence that there was a direct causal link between it and Scott's death. *See Winkler*, 893 F.3d at 901.

In response to the plaintiff's failure-to-train/supervise argument, CCS contends that to hold them liable on that theory, a plaintiff must do more than point to something that CCS could have done to prevent the suicide, citing *City of Canton*, 489 U.S. at 392:

> In virtually every instance where a person has had his or her constitutional rights violated by a [government] employee, a § 1983 plaintiff will be able to point to something the [governing body] "could have done" to prevent the unfortunate incident. Thus, permitting cases against [government entities] for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability on municipalities . . . . It would also engage the federal courts in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake.

Without evidence of a pattern to establish CCS's failure to train, it cannot be found liable for Scott's suicide based on possibilities that, in hindsight, might have prevented his death. Indeed, there is no such evidence in this record.

In summary, we conclude that the district court did not err in absolving CCS of liability under a *Monell* theory for Scott's death. First, the record does not establish that the CSS staff acted with deliberate indifference to Scott's medical needs. They evaluated him upon intake, followed up with his pharmacy and filled his prescription, placed him in detox despite few-to-no symptoms of withdrawal, evaluated his stomach pain, scheduled follow-ups, and performed an

initial mental-health screening. Any error they committed does not rise to the level of deliberate indifference. Second, there is no evidence of a custom or pattern of practice showing that CCS had been deliberately indifferent to the needs of inmates. Last, there is no direct causal link between any actions or inactions of CCS and Scott's death, nor were any CCS policies the "moving force" behind the injury at issue. *See Doe*, 103 F.3d at 511.

## C. The *Batson* Challenge

We review a district court's resolution of *Batson* challenges under a clearly erroneous standard, granting "great deference" to a district court's ruling on whether the use of a peremptory challenge violates the equal protection clause. *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 521 (6th Cir. 2001), *overruled on other grounds by Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006) (citation omitted).

There were 43 potential jurors in the pool, four of whom were African American, but of the 18 brought forward for the selection process, only two were African American—and the defendants used peremptory strikes against them both. After the defendants used their last strike against an African American, the plaintiff issued a *Batson* challenge, claiming that the defendants had engaged in racial bias. "It is settled that the Constitution's guarantee of equal protection ensures that a party may not exercise a peremptory challenge to remove an individual on account of that person's race." *McCurdy*, 240 F.3d at 521 (citing *Batson v. Kentucky*, 476 U.S. at 521). The district court ultimately ruled, however, that the defendants' race-neutral justification for using the strikes was reasonable and that the plaintiff failed to meet her burden of showing racial motivation.

A full analysis of the jury selection pool demonstrates the propriety of the district court's decision. The first group of potential jurors called by the district court consisted of eight

individuals. After questioning, the plaintiff used two peremptory strikes against Jurors 7 and 55. The defendants also used two peremptory strikes, first against Juror 40, who had expressed great discomfort about her ability to be impartial because the case was "hitting really close to home," given that her son, an addict, was in prison at the time. The other strike was against Juror 73, who said her brother had been in jail on more than one occasion, that her sister died of an overdose, and that her brother, sister, and father had all attempted suicide.

The court replaced the four dismissed jurors with four more—one of whom the court dismissed for cause and replaced immediately. From this group, the court also dismissed Juror 84 because of childcare issues, upon the urging of defense counsel. Juror 84, notably, also had a sister who was an addict serving time in jail, and she herself had spent 45 days in jail. The defendants used their third peremptory strike against Juror 11, an African American man who had spent 14 days in jail.

The court next called three more potential jurors to the box. The court dismissed one for cause, and the plaintiff used her second and third strikes against Jurors 68 and 107. The district court then called two new jurors into the box with each party having one remaining peremptory strike. Juror 21 had a brother with an addiction problem who had been in jail. Juror 62, an African American man, had a mother who died from an opiate addiction, and he had been in jail, but not convicted, on charges of possession of marijuana and domestic violence. Notably, Juror 62 was also the only juror of the 18 questioned who answered with anything but an unequivocal "no" to defendants' question about negative experience with law enforcement.[4] The defendants used their last peremptory strike against him. It was at that point that the plaintiff's counsel informed the court that he wished to raise a *Batson* challenge to the jury's composition.

---

[4] Juror 62 responded, "[N]ot that I can recall offhand," which the defendants' counsel interpreted as a possible yes, and clarified, "[Y]ou may have, but you can't recall it specifically?" Juror 62 responded, "Right."

In evaluating a *Batson* challenge, courts apply a three-step, burden-shifting framework to determine whether a peremptory strike was racially motivated. First, the challenging party must make a *prima facie* showing that the peremptory strike was discriminatory. *McCurdy*, 240 F.3d at 521. Then the challenged party must offer a race-neutral explanation for the strike. *Id.* The explanation "need not be particularly persuasive, or even plausible, so long as it is neutral." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). Ultimately, the burden shifts again to the challenging party to "demonstrate that the purported explanation is merely a pretext for a racial motivation." *McCurdy*, 240 F.3d at 521 (citing *Harris*, 192 F. 3d at 586).

The *Batson* challenge in this case was raised in response to the defendants' strike of Juror 62, a man named Willis. The plaintiff successfully presented a *prima facie* case of discrimination by showing that the defendants used two of their four strikes to remove the only two African American veniremen that the court called for questioning. Defense counsel then explained that they were looking for things that "might be risky from a defendant's point of view," such as negative experience with law enforcement or time spent in jail, particularly when it pertained to domestic violence charges. Counsel explained that Willis, "of all the jurors, is the only one that responded favorably" to having negative experiences with law enforcement and, also, that Willis had spent time in jail for a charge of domestic violence. The plaintiff then responded to the defendants' explanation, claiming it was pretextual for several reasons. First, she challenged whether Willis had indeed claimed to have had a bad experience with law enforcement because his answer to the defendants' question was equivocal. Second, she pointed out that Willis had spent "less than a day in jail" each time he was arrested. Last, the plaintiff contended that, if they were sincere, the defendants also should have struck Juror 21, who was white and had a brother who had been in jail. The defendants rebutted these claims, however, by pointing out that they

had only one strike remaining when they struck Willis and that in choosing between someone who had been in jail on domestic violence charges and someone who had a brother in jail, the challenge was better used on the former. Ultimately, the district court found that the defendants' justification was persuasive and overruled the *Batson* challenge.

Courts may rely on several factors to determine whether a strike was racially motivated. The ultimate question before a court is whether "all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the [defendants'] strike of black prospective juror [Willis] was not 'motivated in substantial part by discriminatory intent.'" *Flowers v. Mississippi*, 139 S. Ct. 2228, 2235 (2019) (citing *Foster v. Chatman*, 136 S.Ct. 1737, 1754 (2016)).

"Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred." *Id.* at 2248. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). On appeal, the plaintiff contends that racial motive was apparent because the defendants failed to dismiss two similarly-situated white jurors—Juror 21, who had a brother in jail, and Juror 68, whose cousin was incarcerated. As noted above, however, when Juror 21 and Willis were called to the jury box for questioning, the defendants had only one strike remaining and chose to exercise it against the potential juror who himself had been in prison. Further, the plaintiff neglects to mention that she herself had moved to strike Juror 68 before the defendants had the opportunity to. The plaintiff also points out that the defendants failed to strike Juror 43, who also had personally served time in jail but again

neglects to mention that Juror 43 was selected after the *Batson* hearing, at a time when the defendants had no strikes remaining. These arguments are thus without merit.

"Dramatically disparate questioning of black and white prospective jurors in the jury selection process" also may be probative of racial discrimination. *Flowers*, 139 S. Ct. at 2246. In *Flowers*, for example, the state asked an average of 29 questions of each of the black jurors who were struck but an average of only one question of each seated white juror. *Id.* at 2247. The record showed that there was an insufficient basis to find that the disparate questioning was due to a difference in the potential jurors' characteristics, and the Court held that a *Batson* violation had in fact occurred. *Id.* Here, the plaintiff points to several instances in which defense counsel asked more follow-up questions of black jurors than he did of white jurors.[5] She contends, without citing to the record or her method of calculation, that "[o]n average, black juror candidates were asked 9.5 questions while white jurors that were seated were asked an average of six questions." However, a 9.5:6 ratio is vastly different from the ratios in cases in which the court found the disparity was evidence of discrimination. *See Flowers*, 139 S. Ct. at 2246 (29:1 ratio); *Miller-El v. Cockrell*, 537 U.S. 322, 331-33, 344-45 (2003).

Often, explanations that are clearly post-hoc can serve as evidence that the reason given for a strike is, in fact, a pre-text for discrimination. *See Miller-El v. Dretke*, 545 U.S. at 245-46. Here, the plaintiff contends that the defendants showed that their explanations were pretextual when they offered rationales that clearly were afterthoughts. Defense counsel never changed his rationale, however. He merely expanded his response when given the opportunity to rebut the

---

[5] Juror 84, a white juror that the court ultimately dismissed upon defense counsel's urging because of her childcare issues, had served 45 days in jail. Defense counsel failed to ask why she was in jail but, at that point, she had also said that her sister was an addict who was in custody and that she did not want to serve because of problems with childcare. Also, the defendants still had two strikes left and petitioned the court to dismiss her for cause, which it did.

plaintiff's *prima facie* case. None of the additional responses were "implausible," further distinguishing the case from *Dretke*.

"When [an attorney] misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent." *Flowers*, 139 S.Ct. at 2250. The plaintiff argues that the defense counsel made two such misrepresentations in this case. First, she notes that defense counsel misrepresented the number of days that Juror 11, the other black juror who was struck, served in jail—stating it was 40 days when it was actually 14 days. This mistake was harmless, however, as Juror 11 was not the strike the plaintiff challenged, and the number of days was irrelevant to the point defense counsel was making.

> To be sure, the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination. But when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling.

*Flowers*, 139 S.Ct. at 2250. Because 14 days in jail was still more significant than any other seated juror had spent in prison, the mistake was not a part of "a series of factually inaccurate explanations," but was more likely a hurried mistake. *Id.*

Second, the plaintiff argues that defense counsel deliberately misrepresented whether Willis, Juror 62, had any negative experience with law enforcement. Defense counsel described Willis's response as him "having had a negative encounter with law enforcement sometime in the past." Although there may be alternative interpretations for what Willis meant, it is hardly the "series of factually inaccurate explanations for striking black prospective jurors" that demonstrate clear error and imply discriminatory intent. *Flowers*, 139 S.Ct. at 2250. As noted above, of the 18 jurors questioned by the court, Willis was the only juror who did not give an unequivocal "no" when asked about negative interactions with law enforcement officials.

When we review a *Batson* hearing, we grant great deference to the district court's determination because "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (citing *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). The district court in this case clearly assessed the defense counsel's justifications after considering the reason that counsel used the other peremptory strikes, asking for more details about the case to ensure the rationale was relevant, and responding to the plaintiff's comparison of similarly situated jurors that defense counsel neglected to strike. The district court's analysis indicates that its overruling of the challenge was well thought-out and looked to both the facts in the record and the credibility of defense counsel. We conclude that the plaintiff has failed to show that the district court clearly erred in overruling the challenge.

## D. Challenges to the Admissibility of Evidence

Four evidentiary rulings made by the district court during trial are challenged on appeal. We review a district court's decision on the admissibility of evidence for an abuse of discretion. *United States v. Blanchard*, 618 F.3d 562, 569 (6th Cir. 2010). "[A]n abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard, or when we are firmly convinced that a mistake has been made." *Burley v. Gagacki*, 834 F.3d 606, 617 (6th Cir. 2016) (citations omitted). An evidentiary error warrants reversal only if it is not harmless. *Id.* at 617.

### 1. Inmate-Witness Statements

The plaintiff first appeals the district court's ruling denying the admission of a written statement by Dalman, the inmate who told deputy Cashman that Scott planned to commit suicide. Because the district court ruled that the statement constituted inadmissible hearsay evidence, we

review that decision *de novo*.  *Parker v. Winwood*, 938 F.3d 833, 836 (6th Cir. 2019) (citation omitted).

On the day before his suicide, Scott told several inmates, including Dalman, of his desire to commit suicide, inquiring when the inmates would receive razors.  Dalman became concerned, and it is undisputed that he approached Cashman to relay this information.  Cashman contends that Dalman told her "that Mr. Meirs told him that he intended to cut himself when he next gained access to a razor."  Dalman verified this in a follow-up interview with Detective Brace.  When the inmates provided written statements on the morning after the suicide, Dalman and another inmate wrote that Scott discussed killing himself "the first chance he gets."  The success of the plaintiff's case essentially depended on this latter interpretation of the facts, as it increased the urgency with which Cashman would have needed to act.

As such, the plaintiff opposed the defendants' motion *in limine* asking the court to exclude "[a]ny comments or questions regarding statements, oral (recordings) or written by inmates . . . because they are inadmissible under FRE 802 and/or FRE 401."  Ultimately the district court granted the defendants' motion to exclude the evidence as hearsay.  On appeal, the plaintiff contends that the statements should have been admitted because they "were not being offered to establish the truth of their contents."  She argues, instead, that the statements "were being provided to establish what information Cashman would have been provided with had she done as she was supposed to do and taken the statements from the inmates."  But the plaintiff does not direct the court to any precedent holding that out-of-court statements made *after* an event can be used to justify an action taken *before* the event at issue.  Counsel clearly offered the statement to demonstrate that Dalman told Cashman that Scott was contemplating suicide the first chance he got in an effort to prove the truth of the matter asserted.  Hence, the statement was properly

disallowed by the district court as inadmissible hearsay.[6]  Moreover, our review of the record reveals that counsel managed to get the information before the jury in any event.[7]

### 2. Exclusion of Scott's Kite

Next, the plaintiff contests the district court's ruling that allowed only a portion of Scott's jail kites to be admitted into evidence.  She concedes that the kite is hearsay but argues that it should be admitted under Federal Rule of Evidence 803(3), which allows for hearsay evidence to be admitted if it is a statement of a then-existing state of mind.  Because resolution of this issue does not depend on whether the evidence is hearsay but, rather, whether the evidence was admissible, it is reviewed for an abuse of discretion.  *See Parker*, 938 F.3d at 836.

The kite read, "Bald [correction officer] works 6 pm to 6 am.  I called for medical and he refused to assist.  He is unwilling to assist, here to collect a check.  Give him the boot!"  The district court ultimately allowed the kite into evidence but redacted it so that only "6 pm to 6am. I called for medical" was available to the jury.  The court reasoned that calling for medical was a statement of mental, emotional, or physical condition, admissible as an exception under 803(3),

---

[6] Alternatively, the plaintiff argues only in her reply brief that the statement is admissible to establish consistency with the declarant's testimony and was offered to "rehabilitate the declarant's credibility as a witness when attacked on another ground," relying on Fed. R. Evid. 801(d)(1)(B).  Under *United States v. Reliford*, the written statements might have been admissible "as prior consistent statements to rebut an express or implied charge of recent fabrication."  58 F.3d. 247, 249 (6th. Cir. 1995).  Here, the district court did not, in advance of Dalman's testimony, find that the statement might come in as a prior consistent statement through the defense's cross-examination.  However, the plaintiff did not raise that issue after cross-examination.

[7] In any event, any error in denying admission of this written statement was harmless.  Over several objections, plaintiff's counsel essentially was able to have the statement read to the jury.  When Dalman was on the stand, despite being asked the same question regarding what he told Cashman in several different ways, Dalman answered that he told her "Scott was going around talking about committing suicide and asking about razors."  He testified several times that counsel never mentioned a time frame, nor did he tell Cashman about any time frame.  At that point, the plaintiff's counsel asked Dalman if he had "any memory of either Mr. Meirs saying to you or anyone else that he wanted to commit suicide first chance he got?"  Dalman responded, "Yes, I wrote that in my statement."  Counsel continued to press Dalman on what he told Cashman and what he had written in his statement the next morning.  When Dalman indicated on one occasion that he did not remember his exact statement, the district court allowed Dalman to use the written statement to refresh his memory.  The jury witnessed Dalman turn to the statement and read it, confirm that it was his handwriting, and then proceed to say he now remembered that what he told Cashman was that Scott "was going to commit suicide basically at the first chance he got."  Although the court refused to admit the written statement into evidence, it was clear to the jury what it was and what it said.

and allowed the timestamp for temporal reference. The remainder of the kite, the district court ruled, simply contained narrative statements of fact unrelated to anything Scott may have been thinking about his emotions or medical conditions.

> Under Federal Rule of Evidence 803(3), hearsay may be admissible if it is:
>
> A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

"[T]he declarant must not have had an opportunity to reflect and possibly fabricate or misrepresent his thoughts." *United States v. LeMaster*, 54 F.3d 1224, 1231 (6th Cir. 1995). It is unclear, and the plaintiff conceded as much, when Scott filled out the kite. It is possible—indeed, likely—that he had the opportunity to reflect on his experience with the officer prior to filling out and delivering the kite. Further, Rule 803(3) itself explicitly excludes "a statement of memory or belief to prove the fact remembered or believed." The district court determined that the remaining language in the kite—that "he refused to assist" and "he was unwilling to assist"—was a "statement of fact, unrelated to anything that Mr. Meirs may have been thinking about his emotional or medical condition." These statements align with what the rule excludes, *i.e.*, "a statement of memory or belief." Fed. R. Evid. 803(3). The plaintiff argues that the rest of the kite, including "here to collect a check. Give him the boot!" demonstrates Scott's "highly agitated state" of mind at the time. But as the rule states, even when a statement may be admitted because it shows the declarant's state of mind, any portion of it that includes statements of memories or "facts remembered or believed" must be excluded. Fed. R. Evid. 803(3). The omitted statements are just such expressions. As such, the district court did not err when it admitted only a portion of the kite.

### 3. Captain Baar's Testimony on Jail Policy

Next, the plaintiff argues that the district court erroneously allowed the defense to introduce testimony that the defendants followed jail policies while excluding the plaintiff's evidence regarding the deficiencies in those policies. After the dismissal of all *Monell* claims, the defendants filed a motion *in limine* asking the court to preclude evidence pertaining to the deficiencies in "[t]he policies or procedures of the Ottawa County Sheriff, including but not limited to training, booking, health care, mental health care, detection and prevention of jail suicides, cell checks, kite processing, inmate discipline and/or post-suicide jail review." The defendants contended that the introduction of any such evidence would be tantamount to an "appeal to the passions of the jury or confuse the jury as to relevant culpability." The plaintiff agreed that evidence regarding policy should be barred by the court, but premised the concurrence

> on the understanding that this limitation applies equally to Plaintiff and Defendants, and that Defendants will likewise be precluded from using the dismissed defendants' conduct and/or the fact of their dismissal to point a finger at them or otherwise attempt to use an "empty chair" defense in an effort to deflect blame from Defendants Cashman, Dirette and/or Murin.

The district court ruled that both parties were precluded from introducing testimony regarding the alleged deficiencies of the dismissed defendants but reserved its decision on allowing Captain Baar to testify concerning the remaining defendants' compliance with jail policy. The district court explained that the admission of the testimony "depend[ed] on the way the proofs are presented at trial" and that if it was admitted, the plaintiff then would be allowed to "explore any potential deviations from jail policy and argue that the deviation evinces a conscious disregard to [Scott's] psychological needs and safety."

In his opening argument, the plaintiff's counsel made several references to policies of the jail and to the defendants' failure to follow that policy. Specifically, counsel told the jury:

> You're going to learn some of the Ottawa County written policies themselves. One of them is … what the officers are required to do when an inmate displays a threat of harming himself … Again, they didn't do any of these things when they were on notice that this man was potentially suicidal.

Such statements clearly opened the door for rebuttal by the defendants.

When Baar testified, a significant portion of his testimony—on both direct and cross-examination—concerned whether the defendants acted in accordance with established jail policies. The defendants now argue that this testimony was necessary to demonstrate that they "did not unreasonably disregard the risk that Scott Meirs might kill himself" and, as a result, that the plaintiff was unable to satisfy the subjunctive component of the deliberate-indifference standard. Counsel for the plaintiff never objected to such use of the policies. In her motion *in limine*, her concern was that the defendants would point to the alleged deficiencies in the policies and procedures to shift guilt away from the deputies. As it turned out, the defendants never implied that the policies were deficient, nor did they question Baar about the sufficiency of the policies. Further, the plaintiff did not object when the jail's suicide-prevention policy was admitted into evidence. The testimony regarding the defendants' compliance with official policy was relevant, and the plaintiff points to no precedent or rules that would warrant exclusion of the testimony.

### 4. Evidence of Dalman's Crime

In a final issue, the plaintiff argues that the district court erred in admitting testimony regarding the nature of witness Dalman's crime. In advance of Dalman testifying at trial, the plaintiff submitted a motion *in limine* to exclude evidence of the crime for which Dalman was convicted. She did not contest that Rule 609(a)(1)(A) allowed the defendants to introduce the substance of Dalman's conviction, but she argued that defense counsel's classification of it as "rape" in closing arguments was prejudicial. The district court denied the motion, relying upon

the provisions of Federal Rule of Evidence 609(a)(1)(A).[8] On appeal, the plaintiff concedes that under Rule 609, "the jury was entitled to know that Dalman was convicted of a felony," but argues—without citing to support—that the precise nature of the crime should have been excluded because it did not involve dishonesty or a false statement. The district court's ruling on such a matter is reviewed for an abuse of discretion.

In applying the Rule 403 balancing test, the district court found that "Congress has decided that all felonies are probative of truthfulness and thus relevant for purposes of impeachment," citing *Donald v. Wilson*, 847 F.2d 1191, 1197-98 (6th Cir. 1998), *abrogated on other grounds by Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 525-26 (1989) (stating that Congress debated whether Rule 609 should be limited to "*crimen falsi*" but ultimately declined to add such a limit to the final rule). As in *Donald*, the jury in this case already knew Dalman was a convicted person "as the entire scenario unfolds in a jail." *Id.* at 1198 (holding that a witness's rape conviction was admissible in a civil trial for impeachment purposes). Plaintiff's counsel asked Dalman on direct examination about his conviction, to which Dalman replied that he was serving 17-40 years for criminal sexual conduct. Although he did not describe his crime as "rape," the judge correctly held that the nature of the crime was admissible. Describing it in different terms at closing argument does not warrant a new trial. We conclude that the district court did not abuse its discretion in allowing the nature of Dalman's crime to be revealed to the jury.

## CONCLUSION

For the reasons set out above, we conclude that the plaintiff can point to no error in this matter that justifies reversal or a new trial. We therefore AFFIRM district court's judgment.

---

[8] Rule 609(a)(1)(A) states that evidence of a criminal conviction to be used for "attacking a witness's character for truthfulness" must be admitted in a civil case, subject to Rule 403, "for a crime that, in the convicting jurisdiction, was punishable by death or by imprisonment for more than one year."